## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**RANDALL B. VAUTOUR,**                  )
                                         )
      **Plaintiff,**                  )
                                         )     **Civil Action No.**
      **v.**                            )     **10-12171-FDS**
                                         )
**MICHAEL J. ASTRUE, Commissioner,**     )
**Social Security Administration,**      )
                                         )
      **Defendant.**                  )
                                         )
_____


## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

      This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying the application of plaintiff Randall B. Vautour for Social Security

Disability Benefits ("SSDI").  The Administrative Law Judge ("ALJ") essentially determined that

when plaintiff was abusing drugs, his anxiety disorder rendered him disabled, but that if he

stopped abusing drugs, his disorder would not prevent him from working.

      Plaintiff, who is proceeding _pro se_, appears to dispute the denial of his claim on the

ground that evidence regarding his upper neck, shoulder, and lower back problems was

improperly omitted during his administrative appeal, and should have been considered along with

the evidence regarding his mental health disorders.

      Defendant has moved for an order affirming the decision of the ALJ.  For the reasons set

forth below, the motion will be granted.

## I.      Background

### A.      Educational and Occupational History

Plaintiff Randall Vautour was born on July 26, 1953.  (A.R.. at 12).  He attended high

school but did not complete the twelfth grade.  (*Id*. at 37).  He earned his General Educational

Development (GED) credential in 1987.  (*Id*. at 37, 222).  He has received training in small-

engine repair for one year, machine-shop skills for five years, quality-control inspection for six

months, and research and development for two to three years.  (*Id.* at 37-38).

From 1989 to 1991, Vautour worked in shipping and receiving.  (*Id*. at 147).  From 1991

to 1994, he worked as a quality-control inspector.  (*Id*.).  From 1994 to 1998, he worked in

research and development.  (*Id.*).  From 1998 to 2000, he worked as a printer technician.  (*Id*.,

171).[1]  From 2000 to November 2005, he worked as a copier service technician.  (*Id*. at 147).  In

that capacity, he visited businesses to repair copier machines, explained the machines' problems to

the businesses' employees, and ordered replacement parts for those machines.  (*Id*. at 148).

At some point, Vautour became addicted to Oxycontin.  He entered a detoxification

program at Bournewood Hospital on November 8, 2005.  His employment as a copier service

technician was terminated as of that date.  (*Id*. at 39, 40, 163).

### B.      Mental Health and Substance Abuse

On November 8, 2005, Vautour went to Bournewood Hospital for detoxification from

Oxycontin dependence.  (*Id*. at 202).  He had begun using opiates three years earlier, and had

been using Oxycontin almost daily for the last two years.  (*Id.*)  He felt that his drug use had

---

[1] The record does not provide specific information as to Vautour's responsibilities when he worked in those positions.

2

gotten out of hand, and that the drug was controlling him. (*Id.*). He claimed that his Oxycontin use had not affected his job as a copier technician, although he admitted to using it in the mornings before work. (*Id.*).

Mark Brudniak, M.D., performed a mental status examination and found Vautour to be "alert and oriented, well-groomed with good eye contact." (*Id.* at 203). He described his thought process as logical, without flight of ideas, tangentiality, loosening of associations, or paranoid ideations. (*Id.*). He observed his mood as anxious, but noted that his insight and judgment appeared to be fair. (*Id.*).

Vautour denied any history of depression or medical problems, although he reported a history of a painful stiff neck, for which he had been taking Oxycontin. (*Id.* at 202, 203). He stated that although he had consumed alcohol in the past, he had never undergone alcohol abuse treatment. (*Id.* at 202)

Upon his admission to Bournewood, Vautour was detoxified with methadone. (*Id.* at 203). He informed the doctors that he was not receiving enough methadone, and was notably irritable. (*Id.*). As the detoxification progressed, his withdrawal symptoms lessened considerably; he became less irritable and more compliant with treatment. (*Id.*). Prior to discharge, Vautour requested anxiety medication, hoping to be prescribed Valium. (*Id.*).

His condition upon discharge was listed as "improved" and he was prescribed a daily dosage of 50 milligrams of trazodone. (*Id.*).[2]  He claimed that he intended to attend Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings, and find a sponsor to help him maintain his

---

[2] Trazodone is prescribed for the treatment of major depressive disorder in adults.  Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1684119 (last visited Mar. 28, 2012).

sobriety.  (*Id.*).

On November 22, 2005, Vautour began seeing Dr. Robert Hopkins for outpatient treatment.  (*Id.* at 222).  He told Dr. Hopkins that he had experienced severe anxiety symptoms for years.  (*Id.* at 223).  He had had trouble finding a drug that effectively treated his anxiety, and had begun buying Oxycontin on the street.  (*Id.*).  He stated that the trazodone prescribed by the doctors at Bournewood had given him a headache, but wondered if the headache had been alcohol-induced because he had been drinking the previous evening.  (*Id.*).  He reported that he had a history of drinking, and that he would drink alcohol if he did not have Oxycontin.  (*Id.*).  Dr. Hopkins found that "[r]ight-sided headache precipitated by trazodone was suspicious for the diagnosis but his history was not really consistent."  (*Id.*).

Dr. Hopkins prescribed Valium.  (*Id.* at 223).  He advised Vautour of the risks of sedation, but told him that if the prescribed dosage was insufficient, he should try a larger dose.  (*Id.*).  The Valium was effective in relieving Vautour's anxiety.  (*Id.*).

On November 28, 2005, Vautour telephoned Dr. Hopkins to say that the prescribed Valium was no longer effective in relieving his symptoms.  (*Id.*).  Dr. Hopkins wrote him an a prescription for Risperdal in addition to the Valium.  (*Id.*).[3]

On December 2, 2005, Vautour told Dr. Hopkins that he had spilled his bottle of Valium into the kitchen sink and lost most of the remaining pills.  (*Id.*).  Since that time, he had been taking two Risperdal a day, along with two or three Valium.  (*Id.*).  Dr. Hopkins increased his prescribed dosage of Valium, and instructed him to continue taking the Risperdal.  (*Id.* at 224).

---

[3] Risperdal is prescribed for the treatment of schizophrenia and bipolar disorder.  It is a brand name of risperidone.  Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=606 (last visited Mar. 28, 2012).

On December 13, 2005, Vautour informed Dr. Hopkins that he had nearly exhausted his medication.  (*Id*.).  Dr. Hopkins surmised that he had been taking his medication at two or three times the rate at which it had been prescribed.  (*Id*.).  In addition, Vautour had since visited another physician and had obtained a week's supply of tramadol, which he had exhausted in four days.  (*Id*.).[4]  Dr. Hopkins felt that Vautour was intoxicated, and noted that his thinking appeared slowed, his memory was impaired, his speech was slowed and slightly slurred, and his pupils were shrunken to pinpoints.  (*Id*.).  Dr. Hopkins told Vautour that he did not think he could treat him as an outpatient because he needed to be admitted for detoxification.  (*Id*.).  He also advised Vautour of the risk of withdrawal seizures.  (*Id*.).  Vautour refused to return to the hospital voluntarily.  (*Id*.).

On December 14, 2005, Vautour presented at the emergency room at Emerson Hospital for detoxification from benzodiazepines, alcohol, and Oxycontin, and for treatment for chronic pain and anxiety.  (*Id*. at 206, 209, 215).[5]  He was admitted to North 5, a locked psychiatric unit, and treated by an interdisciplinary team comprised of internal medicine, social services, and addiction personnel.  (*Id*. at 206, 209).  Maureen Malin, M.D., noted that he abused Oxycontin, Valium, Ultram, and risperidone, and that "he [was] actually unable to appreciate the fact that he was severely addicted to his Valium."  (*Id*. at 206).  She further noted that although he began the detoxification process, he later asked to be discharged because he thought he would do as well

---

[4] Tramadol is a prescribed for the management of moderate to severe chronic pain.  Its brand names include Ryzolt and Ultram.  Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1013 (last visited Mar. 28, 2012).

[5] Benzodiazepines are parent compounds for the synthesis of a number of psychoactive compounds, such as the anti-anxiety agents diazepam and chlordiazepoxide.  STEDMAN'S MEDICAL DICTIONARY 198  (27th ed. 2000).

with outpatient treatment, and he was worried about his job.  (*Id.*).

Robert P. Collins, M.D., observed that Vautour lacked homicidal or suicidal ideation and denied alcohol abuse.  (*Id.* at 208).  However, Vautour reported to Dr. Malin that he had increased his alcohol consumption on weekends, stating that he consumed half a case of beer and two drinks.  (*Id.*).  Dr. Malin made differential diagnoses that included benzodiazepine abuse and dependence history, polysubstance use history, and alcohol abuse.  (*Id.* at 207).

On December 20, 2005, Vautour was discharged from Emerson.  (*Id.* at 207).  Dr. Malin observed that Vautour was in the process of completing his Valium taper and was much less depressed, although he was still "somewhat anxious and angry, and quite fixed in how he wanted to pursue his medication."  (*Id.* at 207).  She diagnosed polysubstance abuse, anxiety disorder NOS, chronic neck pain, and an inability to recognize his serious dependence on addiction drugs.  (*Id.*).  Dr. Malin scheduled outpatient treatment, and suggested that he attend two to three AA meetings per week.  (*Id.*).  Vautour refused to attend an accelerated recovery program.  (*Id.*).

Vautour continued to see Dr. Hopkins following his discharge from Emerson.  (*Id.* at 224).  On December 22, 2005, Vautour reported that he was "feeling great" and that he had slept in the day before until almost noon.  (*Id.*).  Dr. Hopkins felt that Vautour was oversedated, and noted "his speech was slowed but he denied all this and said he was fine."  (*Id.*).

On December 28, 2005, Vautour told Dr. Hopkins that although he was not suffering from significant anxiety or pain, he felt that he was sleeping too much.  (*Id.* at 225).  Dr. Hopkins recommended that Vautour discontinue his daytime Seroquel, which he believed induced

drowsiness, and suggested that he take Tylenol or Excedrin for his pain.  (*Id.*).[6]  The next day,

Vautour called Dr. Hopkins to complain that "his stomach was in knots."  (*Id.*).  Dr.  Hopkins

believed he was experiencing tramadol withdrawal.  He suggested to Vautour that the symptoms

would abate once Vautour had spent more time off of opiates, and noted that he was "quite

insistent that I should think of another pill that he could take to relieve his anxiety."  (*Id.*).

On January 10, 2006, Dr.  Hopkins noted that while Vautour seemed to have improved,

he stated that he still felt "too wound up . . . to return to work."  (*Id.* at 226).  He observed that

"[V]autour seemed to have little in the way of intellectual resources to deal with his discomfort,

and spent too much time watching television and focusing on how he feels."  He believed that

Vautour's anxiety would improve if he returned to work and stayed active.  (*Id.*).  Dr. Hopkins

converted Vautour's prescription for Inderal to one for the long acting-version, Inderal LA.

On January 18, 2006, Vautour told Dr. Hopkins that he was not feeling much better, and

that he was disappointed that the Inderal that Dr. Hopkins had recently prescribed had not been

more effective.  (*Id.*).[7]  Although Dr.  Hopkins had switched Vautour from the short-acting

version of Inderal to the long-acting Inderal LA at an increased dose, he realized that Vautour had

been taking both versions of the drug.  (*Id.*).

Dr. Hopkins found that Vautour's symptoms were more typical of agoraphobia than a

panic disorder.  (*Id.*).  Dr. Hopkins suggested that Vautour try Celexa, but thought that he instead

---

[6] Seroquel is prescribed for the treatment of schizophrenia and bipolar disorder.  Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=124 (last visited Mar. 28, 2012).

[7] Inderal is prescribed for the management of hypertension.  It is the brand name of propranolol. Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1968 (last visited Mar. 28, 2012).

wanted "[s]omething that would give him instant relief when he started to feel bad." (*Id.*).[8]  Dr.

Hopkins noted that this was typical of patients who had a history of alcohol problems, because

they were used to drinking to relieve their discomfort quickly. (*Id.*).  Vautour began taking

Celexa. (*Id.*).

On February 1, 2006, Dr. Hopkins told Vautour that he had spoken to his internist and

had subsequently received a fax request from the pharmacy for Valium, which he refused to fill.

(*Id.*).  Dr. Hopkins noted that "[V]autour then went into an impassioned plea for Valium" and

promised that he would control his Valium use. (*Id.*).  Dr. Hopkins told him that he would not

prescribe the Valium without a corroborating second opinion. (*Id.*).  Vautour told Dr. Hopkins

that he would take his suggestion of taking extra clonidine instead, and Dr. Hopkins doubled his

dose. (*Id.*).[9]

On February 15, 2006, Vautour informed Dr. Hopkins that his wife had left him earlier

that week after he lost his temper and broke her cell phone. (*Id.* at 228).  He admitted to drinking

three beers. (*Id.*).  He also refused to take his Seroquel during the day, as he believed he had seen

a television advertisement containing a warning regarding the drug's safety, but Dr. Hopkins

thought he was "mixed up" and had instead seen a warning for a different drug. (*Id.*).  Dr.

Hopkins refused to give him Valium, instead prescribing Zyprexa, an anti-depressant. (*Id.*).  Dr.

Hopkins concluded that "he seems really totally unable to deal with things and it is the wife who

does deal with things." (*Id.*).

---

[8] Celexa is prescribed for the treatment of depression.  It is the brand name of citalopram hydrobromide.
Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=447 (last
visited Mar. 28, 2012).

[9] Clonidine is prescribed for the treatment of hypertension.  Physicians' Desk Reference, PDR.net,
http://www.pdr.net/drugpages/concisemonograph.aspx?concise=263 (last visited Mar. 28, 2012).

On March 1, 2006, Dr. Hopkins noted that Vautour continued to complain of anxiety but did not appear anxious. (*Id.*). He informed Vautour that he should stop taking every drug except for clonidine. (*Id.*). He thought that starting him on Depakote might reduce his irritability and mood shifts, but observed that Vautour seemed displeased by this suggestion, because "[h]e wanted to have what he called a tranquilizer and . . . he wanted to have something that worked very promptly, not any kind of long-acting agent." (*Id.*).[10]

On March 6, 2006, Vautour telephoned Dr. Hopkins to tell him that his medication was not working. (*Id.*). After Dr. Hopkins questioned him, he admitted that he had been experimenting with it, taking different combinations of medications than Dr. Hopkins had prescribed, and adding other medication that had been prescribed by his internist. (*Id.*). Dr. Hopkins noted that Vautour did not remember accurately what he had or had not taken, and suggested that he continue with his drug regimen as it had been prescribed. (*Id.* at 229). Vautour expressed dissatisfaction at that suggestion. (*Id.*). He also told Dr. Hopkins that his wife had left him again the day before, but could not describe why she left. (*Id.* at 228-29). He denied drinking beer. (*Id.* at 229).

On March 16, 2006, Vautour told Dr. Hopkins that he was still having trouble sleeping and continued to feel very anxious during the day. (*Id.*). Dr. Hopkins found that in spite of his complaints, he appeared very calm, although he perceived some akathisia. (*Id.*).[11] When Dr. Hopkins suggested that Vautour resume taking Remeron to help him sleep and alleviate his

---

[10] Depakote is prescribed in the treatment of bipolar disorder. Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=11 (last visited Mar. 28, 2012).

[11] Akathisia is a syndrome characterized by an inability to remain in a sitting posture, combined with motor restlessness and a feeling of muscular quivering. STEDMAN'S MEDICAL DICTIONARY at 41.

9

daytime anxiety, he noted that Vautour appeared "disgusted." (*Id*.).  He concluded "[I] think that he, in fact, is not very anxious but wants me to prescribe Valium for him again." (*Id*.).  Dr. Hopkins suggested that Vautour return to work, perhaps at a machine shop, but noted that Vautour became angry at this suggestion and claimed that there was no way he could return to work. (*Id*.).

On April 19, 2006, Vautour said he had been sleeping well, but complained of anxiety. (*Id*. at 230).  Dr. Hopkins continued to discuss with Vautour the possibility of returning to work. (*Id*.).  Vautour indicated that he might be interested in either a shipping-and-receiving job or driving a delivery van, and that when his condition improved, he might go to the unemployment office to learn more about any job training programs it offered. (*Id*.).  He maintained, however, that he was still too anxious to work, that he could not even fill out a job application, and that his hand shook with nervousness in the morning. (*Id*.).

On May 17, 2006, Dr. Hopkins again discussed employment with Vautour. (*Id*. at 231).  Dr. Hopkins asked whether he had considered electrical work or plumbing, but Vautour felt that those jobs would be "too much for him." (*Id*.).  Dr. Hopkins found that he continued to be downcast and to complain of anxiety, but again noted that his symptoms more closely resembled those of agoraphobia. (*Id*.).  He did not detect anxiety. (*Id*.).

On May 31, 2006, Dr. Hopkins found that while Vautour did not sleep as well since discontinuing the Remeron, he had maintained a fairly high level of activity that included mowing the lawn, working on his house, and riding his motorcycle. (*Id*.).

On June 14, 2006, Dr. Hopkins observed that Vautour had put on weight and continued to complain of anxiety, although again he did not find him anxious. (*Id*.).  He suggested that

Vautour seek a consultation concerning his condition, but Vautour was apprehensive about traveling into Boston or Belmont. (*Id.* at 232). Dr. Hopkins noted that his anxiety appeared to be specifically related to dealing with novel situations, such as traveling to unfamiliar places or interviewing for a job, and continued to adjust his medication. (*Id.*).

On June 27, 2006, Vautour visited Dr. Hopkins with his wife. (*Id.*). Dr. Hopkins reviewed his diagnoses, which included substance abuse and anxiety. (*Id.*). Vautour had visited Dr. Jeffrey Speller, who had diagnosed Type 2 bipolar disorder and generalized anxiety. (*Id.*). Dr. Speller suggested that Vautour completely change his medications, discontinuing the three drugs that Dr. Hopkins had prescribed and adding five others. (*Id.*). Dr. Hopkins discontinued his clonidine prescription, reduced his Klonopin[12] dosage, and substituted an Elavil[13] prescription for Effexor.[14] (*Id.*).[15]

On July 12, 2006, Dr. Hopkins noted that Vautour said that he had not been sleeping well since discontinuing the Elavil. (*Id.*). He claimed his anxiety and agoraphobia had increased.

---

[12] Klonopin is is prescribed to treat panic attacks and seizures. It classified as a benzodiazepine. It is a brand name of clonazepam. Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1249 (last visited Mar. 28, 2012).

[13] Elavil is prescribed to treat depression. It is a brand name of amitriptyline. Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=695 (last visited Mar. 28, 2012).

[14] Effexor is prescribed to treat depression. It is a brand name of venlafaxine. Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1559 (last visited Mar. 28, 2012).

[15] On July 5, 2006, Dr. Hopkins wrote a letter to the Hartford Insurance Company in which he stated that while Vautour had recovered from his opiate dependence and his neck and shoulder pain, he continued to be disabled by his anxiety disorder, and was totally unable to work. (*Id.* at 220). Vautour received short-term disability insurance benefits from Hartford in October 2006. (*Id.* at 233).

(*Id.*).  Dr. Hopkins, acting at the suggestion of Dr.  Speller, added Abilify[16] to his regimen.  (*Id.*).

On August 9, 2006, Dr. Hopkins found that "[p]atient was uncharacteristically chatting a blue streak, talking about riding his motorcycle and going on at length about how much he likes that and where he had been, and going to the shop and telling stories about other people who ride motorcycles."  (*Id.* at 232-33).  Vautour told Dr. Hopkins he had been doing chores around the house, and had been sleeping well since he had started taking amitriptyline (Elavil), even remarking that it was "perfect."  (*Id.* at 233).  He had been sleeping for eight hours a night and was active during the day.  (*Id.*).  Dr. Hopkins found that he had fewer complaints and was in a better mood than he had ever observed.  (*Id.*).

On September 6, 2006, Vautour recounted to Dr. Hopkins a long story about repairing the brakes on his wife's car and fixing the alternator on his truck.  (*Id.*).  While he felt that his mental health had improved, he became extremely nervous upon taking his truck to be inspected. (*Id.*).  He had been taking two to three Xanax, and wanted to be able to take this amount daily. (*Id.*).  Dr. Hopkins renewed his prescription for Abilify and increased his prescribed dose of Xanax.  (*Id.*).

On October 4, 2006, Dr. Hopkins found that Vautour "was in quite good spirits."  (*Id.*). He had lost several pounds, and his daytime anxiety appeared to have improved.  (*Id.*).  Vautour informed Dr. Hopkins that he was actively seeking employment, and Dr. Hopkins noted "I was impressed that he was spontaneously thinking about returning to work."  (*Id.*).

On November 1, 2006, Dr. Hopkins reviewed Vautour's medication with him, pointing

---

[16] Abilify is prescribed to treat schizophrenia and major depressive disorder.  It is a brand name of aripiprazole.  Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=1961 (last visited Mar. 28, 2012)

out that he had exhausted a four-week supply of an increased dose of Xanax in just over three weeks. (*Id.*). Vautour denied that he had been taking extra pills, and claimed that he may have put some of them in a container to take with him on a trip to Canada. (*Id.*). Dr. Hopkins observed "I am not sure I believe him . . . he was very defensive and in denial." (*Id.*). He also discussed with him that when Vautour called him to request pain medication for a broken rib, he did not disclose that he had been prescribed 40 Vicodin pills by another doctor in addition to 20 pills he had received at the emergency room. (*Id.* at 233-34).[17] Dr. Hopkins told Vautour that he felt that he had misled him in order to get more drugs, and thought that his drug use was getting out of control despite his improvement over the summer. (*Id.* at 234).

On January 5, 2007, Vautour told Dr. Hopkins he felt that he was benefitting from the Ritalin, but did not think it was long-lasting enough. (*Id.*). He also told him that he had gone on a job interview for a position in a leather upholstery shop. (*Id.*). Dr. Hopkins increased his Ritalin dose and discontinued his Abilify. (*Id.*).

On February 7, 2007, Vautour told Dr. Hopkins he felt that he needed an increased dosage of Ritalin, and Dr. Hopkins adjusted his prescription accordingly. (*Id.* at 235).

After Dr. Hopkins suspended his practice in early 2007, Dr. Sten Lofgren, M.D., saw Vautour on several occasions. (*Id.* at 94, 241). On February 27, 2007, Dr. Lofgren diagnosed a generalized anxiety disorder with "no clear precipitant identified." He described Vautour's mental status as anxious, oriented, and without evidence of psychotic thought patterns. (*Id.* at 241). Dr. Lofgren listed his prognosis as "fair to good" based on the diagnosis and his previous response.

---

[17] Vautour presented at the Emerson Hospital emergency room on October 19, 2006, complaining of right-sided rib pain after falling on some rocks. (*Id.* at 204). He was diagnosed with a chest wall contusion and a rib fracture. (*Id.*).

13

(*Id*.).

On April 25, 2007, Dr. Michael Maliszewski, Ph.D., assessed Vautour's psychiatric condition for a disability determination.  (*Id*. at 255, 271).  He determined that Vautour possessed the recall and attention span necessary to perform simple tasks.  (*Id*. at 244, 260).  While Vautour was socially withdrawn and would perform better in a more independent role, he would be able to perform concrete tasks in a supportive work setting.  (*Id*.).  Dr. Maliszewski concluded that Vautour's anxiety-related disorders and substance addiction disorders did not restrict his daily living activities, only moderately limited his ability to maintain social functioning, and only moderately limited his ability to maintain concentration, persistence, or pace.  (*Id*. at 244, 254).

On October 6, 2007, Vautour was brought to the Saints Medical Center Emergency Department after he complained of feeling weak, and then collapsing, while working outdoors. (*Id*. at 275).  Upon arrival, his mental status was acutely altered and his speech was garbled. (*Id*.).  His urine screen for drugs of abuse was positive for benzodiazepines but otherwise negative.  (*Id*. at 280).  His hospital workup revealed elevated levels of amitriptyline (Elavil) in his system, and his doctors attributed his symptoms to an overdose.  (*Id*. at 278).

Vautour stated that the overdose was accidental.  (*Id*. at 310).  He denied current or past drug use, drinking at all during the past year, and any medical problems.  (*Id*. at 281).  He also told his doctors that he had been working repairing coffee machines, and refurbishing one of his old automobiles.  (*Id*. at 281, 304).  He was discharged on October 9, 2007.  (*Id*. at 281).

On June 26, 2008, Vautour was admitted to Emerson Hospital from Lowell General Hospital for evaluation and treatment after the police authorized his hospitalization, believing he

posed a serious risk of harm due to mental illness. (*Id.* at 374).[18]  Vautour had telephoned "911" repeatedly, claiming that he saw trespassers squatting on his lawn. (*Id.*).  He alleged that they had been camouflaging themselves with tree branches and poinsettias, and informed the police that while he was able to restrain several of them, they had managed to escape when the police arrived. (*Id.* at 374, 376).  Vautour also described seeing little toy babies on a wire. (*Id.* at 376).  He said that he had been having these types of experiences for approximately one year. (*Id.*).  He presented at Lowell with psychosis, visual hallucinations, and paranoia, and was physically and chemically restrained due to his inability to understand why he was sent to the hospital. (*Id.* at 274, 363).

After his transfer to Emerson Hospital, Rosemary Lee, N.P., assessed Vautour's mental status as alert and oriented, with mood and affect euthymic. (*Id.* at 374).  She noted that there was evidence of delusional thought process, and observed that his memory was questionable, his cognition was grossly intact, and that his speech was tangential and rambling. (*Id.*).  An MRI of his brain showed no abnormalities. (*Id.* at 371)

Dr. Robert Stern, M.D., further evaluated Vautour's mental status and observed that he appeared anxious and distracted. (*Id.* at 376).  He found his mood to be angry and irritable. (*Id.* at 376).  Dr. Stern concluded that his insight and judgment were poor, and that he was a poor

---

[18] The record refers to a "Section XII" issued by police. (A.R. 374).  The term appears to refer to a Massachusetts statute that permits the police in an emergency situation to restrain or hospitalize persons posing risk of serious harm by reason of mental illness. *See* Mass. Gen. Laws. ch. 123, § 12. ("In an emergency situation, if a physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker is not available, a police officer, who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person.").

historian.  (*Id*. at 376, 377).[19]  Vautour tested positive for benzodiazepines and negative for alcohol.  (*Id*. at 375).  On June 30, 2008, he was released from Emerson against the advice of his physicians.  (*Id*. at 363).

On July 15, 2008, Vautour again presented at Emerson, requesting an evaluation.  (*Id*. at 379).  He reported that after his June 30 discharge, he began to believe that his prescribed medications had contributed to his visual hallucinations, and discontinued all of them except for Ritalin.  (*Id*. at 379, 382).  He was unable to reach and consult with Dr. Lofgren, and his hallucinations had continued.  (*Id*. at 379, 382).

Upon Vautour's admission, Dr. Stern made a differential diagnosis of bipolar disorder; he also noted family, employment, and financial problems.  (*Id*. at 383).  Vautour  acknowledged experiencing visual and occasional auditory hallucinations.  (*Id*.).  Nurse Lee examined Vautour and described his mental status as alert and oriented and his mood and affect as cooperative.  (*Id*. at 380).  She noted that his judgment and insight were impaired, but that his cognition remained grossly intact.  (*Id*.).

Vautour told Nurse Lee that he had resided with his daughter due to marital discord since his last hospitalization at Emerson.  (*Id*. at 379).  While there, he continued to experience visual hallucinations, believing that at nighttime, he saw people camouflaged as trees.  (*Id*. at 380). Nurse Lee found that "[i]t was unclear whether he had any insight into reality testing."  (*Id*.). In addition, Vautour's urine screen tested positive for opiates.  (*Id*.).  Nurse Lee noted "[t]he patient struggled to come up with a reason for why there were opiates in his urine.  (*Id*.).  Vautour

---

[19] Vautour also told Dr. Stern that he had recently had two car accidents.  (*Id*. at 376).  One resulted in a police citation after Vautour was accused of driving in the wrong lane.  (*Id*.).  Dr. Stern noted that Vautour "[c]ontended vociferously that he was in the correct lane, and then someone else crossed in front of him."  (*Id*.).

postulated that perhaps after he had discontinued all of his medications, he was looking for something to take and had rifled around in his old medication bottles and took those pills." (*Id.* at 380-81).

Nurse Lee also reported that Vautour had received a citation for driving under the influence in February 2008, for which a court proceeding was pending. (*Id.*).[20]  Dr. Stern, however, noted that Vautour denied a history of DUIs or detoxifications. (*Id.* at 382).

Dr. Stern discontinued Vautour's Effexor and Ritalin prescriptions, and decreased his Xanax. (*Id.* at 383). Vautour was discharged on July 18, 2008. (*Id.* at 384).

After leaving Emerson, Vautour resumed seeing Dr. Lofgren and obtained new prescriptions for Xanax (alprazolam) and Ritalin (methylphenidate), the drugs for which Dr. Stern had discontinued prescriptions. (*Id.* at 390). On July 25, 2008, Vautour presented at Emerson in an acutely psychotic and agitated state after calling "911" to request assistance in dealing with "pimps with large hats" who had entered his home. (*Id.* at 394). He had armed himself with several knives and an improvised flame-thrower. (*Id.* at 390). The Chelmsford police responded to his call and escorted him to Lowell General Hospital, where he was evaluated, cleared, and transferred to Emerson for further stabilization. (*Id.* at 394).

Upon admission, Dr. Stern made a differential diagnosis that included organic delusional disorder and polysubstance dependence. (*Id.* at 391). While Vautour denied current substance abuse, Dr. Stern believed that he "was abusing methylphenidate (Ritalin), snorting it and doubling his dose." (*Id.* at 390). He assessed Vautour as presenting a clear and present danger for

---

[20] Vautour claimed that at the time of the DUI, his intoxication was due to medication, not alcohol. (*Id.* at 403). He consequently lost his driver's license. (*Id.* at 345).

psychotic violence, and concluded that inpatient psychiatric hospitalization was a medically necessary treatment that could not be provided in a less-intensive setting. (*Id.* at 391).

During his stay at Emerson, Dr. Stern observed that Vautour appeared confused, disorganized, and paranoid. (*Id.*). He prescribed Zyprexa[21] to treat psychosis, and told Vautour that if he requested an early release from the hospital, he would seek involuntary commitment. (*Id.*). He concluded that Vautour completely believed his delusions, and did not think he had a mental illness. (*Id.*). Dr. Stern believed that his visual hallucinations and mental confusion were attributable to Ritalin abuse; it had been reported that Vautour had been snorting the drug at home. (*Id.*). However, he concluded that "[i]t remained difficult to determine if he had a toxic psychosis from overuse of Ritalin or paranoia from a formal thought disorder." (*Id.* at 392). By the following Monday, Vautour had improved; Dr. Stern came to believe that he was paranoid, and that his hallucinations were the result of Ritalin abuse. (*Id.*).[22]

Dr. Stern diagnosed organic drug-induced delusional syndrome and prescribed Seroquel and Zyprexa. (*Id.* at 393, 401). Vautour was discharged on August 4, 2008. (*Id.* at 390). Dr. Stern scheduled a follow-up appointment at Greater Lowell Psychiatric Services for September 8, 2008. (*Id.* at 392-93).

On September 8, 2008, Martha Huff, an RNCS at Greater Lowell Psychiatric Services, evaluated Vautour. (*Id.* at 356). She noted that he had stopped taking his Zyprexa shortly after his discharge from Emerson. (*Id.*). Vautour told her that he was currently taking amitriptyline

---

[21] Zyprexa is prescribed to treat episodes of depression associated with bipolar disorder. It is a brand name of olanzapine. Physicians' Desk Reference, PDR.net, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=691 (last visited Mar. 28, 2012).

[22] Vautour admitted that he had been taking up to and possibly more than twice the amount of Ritalin prescribed by Dr. Lofgren, and also admitted to abusing Xanax. (*Id.*).

(Elavil) and lorazepam.  (*Id*. at 358).  Nurse Huff noted that she needed to corroborate his

prescription information; while Vautour had produced prescriptions from CVS Pharmacy for those

drugs and Effexor, they were old and had last been filled in April 2008.  (*Id*. at 359).  She

diagnosed bipolar disorder NOS and opiate dependence in sustained full remission.  (*Id*.).  She

prescribed Methylin ER, Abilify, amitriptyline (Elavil), and lorazepam on the condition that

Vautour begin therapy.  (*Id*. at 359-360).

On September 17, 2008, Nurse Huff telephoned Vautour and found that he was confused

as to who she was.  (*Id*. at 354).  She suspected that he might have taken more than the prescribed

dosage of lorazepam and denied his request to increase his Ritalin dosage.  (*Id*.)

On September 23, 2008, Vautour told Nurse Huff that the medications she had prescribed

did not work, and requested that she change them.  (*Id*. at 351).  He admitted to overusing his

lorazepam, but stated that he had not yet exhausted all of the four-week supply that she had

prescribed two weeks earlier.  (*Id*. at 353).  Nurse Huff prescribed Concerta to replace the

Methylin ER, increased his Abilify dosage, and wrote a new prescription for lorazepam, dated a

week later, for the same dosage and frequency.  (*Id*. at 352, 353).

Vautour began therapy sessions with psychologist Christine Aposhian on September 23,

2008.  (*Id*. at 341, 345).  She noted that he seemed agitated, aggressive, untruthful, and

uncooperative, and that he wanted to leave after only twenty minutes.  (*Id*. at 346).  Ms. Aposhian

observed that Vautour did not want his previous clinicians to learn about his 2005 Oxycontin

detoxification at Bournewood.  (*Id*. at 345).  She concluded that he was a poor historian, and that

this may have been intentional.  (*Id*.).  Vautour told her that he had experienced a visual

hallucination the previous evening in which a man appeared in his garage.  (*Id*. at 350).  He

expressed that his goal in attending therapy was "[t]o get the medications in him that would help." (*Id*.).

On October 7, 2008, Nurse Huff and Ms. Aposhian met with Vautour and told him that they had concluded that he required a level of care that they could not provide. (*Id*. at 344). Ms. Aposhian recommended that Vautour attend a daily treatment program that included training in coping skills and access to psychopharmacological services. (*Id*. at 341). Vautour refused. He continued to focus on his medications throughout the meeting, requesting an increased dose of Concerta and stating that he had already run out of lorazepam because he had taken excessive doses. (*Id*.). Nurse Huff increased his Concerta dose and prescribed a low dose of clonazepam (Klonopin) to prevent lorazepam withdrawal. (*Id*. at 344). Vautour was discharged, and resumed treatment with Dr. Lofgren later that month. (*Id*. at 75, 341).

### C.    Daily Activities

Vautour lives with his wife of more than 37 years, Cathy Vautour, who has been disabled since 1995 due to post-polio syndrome. (*Id*. at 66, 223). He testified that he spends three or four hours a day caring for her, but they argue constantly when they are in the house together, and those arguments trigger his depression. (*Id*. at 34-35, 65).

On a daily basis, Vautour takes his medication, dresses himself, watches television, prepares meals for himself and his wife, does the laundry, walks in his yard, and does what he can to clean the house. (*Id*. at 139). He is able to perform household chores such as vacuuming, mopping the floor, and putting away the dishes. (*Id*. at 138). He also does the grocery shopping, although he has a hard time leaving the house and feels a strong urge to return home once he does. (*Id*. at 138, 141, 142). On Thursdays, his son-in-law visits him with his two year-old grandson.

(*Id*. at 145)

Vautour testified that he wakes up in the morning and does not want to leave the house. (*Id*. at 64).  He suffers from panic attacks at least once a day, and testified that one attack can last an entire day.  (*Id*. at 64-65).  During these attacks, "his mind and mouth go completely dry" and he feels that he has to be able to "get out, walk out, breathe, do something in order to shake it off." (*Id*. at 64).  He does not feel that his prescription drug regimen has ever been a fully effective course of treatment for his anxiety and depression.  (*Id*.).

Vautour has stated that while he used to be active, outgoing, and interactive, he no longer socializes with others.  (*Id*. at 143, 175).[23]  Large groups of people exacerbate his anxiety.  (*Id*. at 144).  His wife has to remind him to shave and bathe.  (*Id*. at 140).  He is unable to sleep without taking medication, and he remains at home, sleeping, for most of the day.  (*Id*. at 140).  He has difficulty focusing, and has experienced memory loss and cognitive problems.  (*Id*. at 175, 188).  On occasion, he has had visual hallucinations.  (*Id*.).

### D.    Procedural History

On March 6, 2007, Vautour applied for SSDI benefits, contending that he had been unable to work since November 8, 2005, due to anxiety, agoraphobia, fatigue, and concentration problems.  (*Id*. at 92).  The claim was denied at the initial level of review on April 26, 2007. (*Id*. at 19).  In a decision dated March 10, 2008, a federal reviewing official subsequently denied Vautour's claim.  (*Id*.).

After obtaining counsel, Vautour requested a hearing, which was held before an

---

[23] This statement is contradicted by Alfred D. Jonas, a medical expert, who testified during Vautour's hearing that evidence prior to his alleged disability onset date indicated that he felt uneasy around people, especially if they were new to him.  (*Id*. at 80).

21

Administrative Law Judge on November 18, 2008.  (*Id.*).  On December 16, 2008, the ALJ issued

a decision concluding that he was not disabled at any time from his alleged onset date of November

8, 2005, through the date of the decision.  (*Id.* at 20).  The case was selected for review by the

Decision Review Board.  (*Id.* at 1).  The ALJ's decision became the final decision of the

Commissioner when the Board did not act on the claim within 90 days.  (*Id.*).

Vautour appealed the decision to this Court on December 16, 2010, seeking reversal of the

decision.[24]  The SSA has moved for an order affirming the decision of the Commissioner.

## II.   **Analysis**

### A.   **Standard of Review**

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g).  The findings of the Commissioner as to any fact, however, shall be conclusive if

supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion."

---

[24] On December 16, 2010, Vautour wrote a letter to the Court concerning his appeal, which the Court construed as a complaint.  (D.I. 1).  Although he submitted a brief in support of his position on September 8, 2011, he has not filed any formal motions with the Court.  (D.I. 15).  The brief was in the form of a letter with several unmarked attachments. The court will refer to the attachments as follows:

Exhibit A - Letter from Social Security Administration, dated November 8, 2010
Exhibit B - Letter to Ms. Coan regarding letter from Dr. Bhat, dated January 25, 2009
Exhibit C - Letter from Conway Office Products, dated March 14, 2006
Exhibit D - Hartford Life Insurance physician's statement of continued disability, dated January 25, 2006
Exhibit E - Hartford Life Insurance physician's statement of continued disability, dated January 26, 2006
Exhibit F - Long-term disability benefits approval letter from The Hartford, dated October 11, 2006
Exhibit G - Short-term disability benefits approval letter from The Hartford, dated January 5, 2006
Exhibit H - Letter from National Imaging Associates, dated December 10, 2005
Exhibit I - Letter from Dr. Bhat, dated December 16, 2009
Exhibit J - Fax cover sheet from Dr. Hopkins, dated March 30, 2006
Exhibit K - Letter to Dr. Taylor, dated January 24, 2006

*Rodriguez v. Sec'y of Health & Human Srvcs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also*

*Evangelista v. Sec'y of Health & Human Srvcs.*, 826 F.2d 136, 144 (1st Cir. 1987).  It is the

responsibility of the Commissioner, not the courts, to evaluate credibility, draw inferences from the

evidence, and resolve conflicts in the evidence.  *Rodriguez*, 647 F.2d at 222.  While the ALJ must

take medical evidence, "the determination of ultimate disability is for [the Commissioner], not for

the doctors or the courts."  *Lizotte v. Sec'y of Health & Human Srvcs.*, 654 F.2d 127, 128 (1st

Cir. 1981).  For that reason, this Court must affirm the Commissioner's denial "even if the record

arguably could justify a different conclusion, so long as it is supported by substantial evidence."

*Rodriguez Pagan v. Sec'y of Health & Human Srvcs.*, 819 F.2d 1, 3 (1st Cir. 1987).

### B.    Standard for Entitlement to SSDI Benefits

In order to qualify for disability insurance benefits, a claimant must demonstrate that he or

she is disabled within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A), (d)

(setting forth the definition of disabled in the context of SSDI).  The Act defines the term

"disability" as the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  The impairment(s) must be severe enough to prevent the claimant from performing

not only his past work, but any substantial gainful work existing in the national economy.  42

U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations

promulgated under the statute.  20 C.F.R. § 404.1520.  The First Circuit has described the

analytical sequence as follows:

First, is the claimant currently employed?  If he is, the claimant is automatically considered not disabled.

Second, does the claimant have a 'severe impairment' . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]'  If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in Appendix 1 [of the Social Security regulations]?  If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . .  If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:

Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past?  If not, he is not disabled.  If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy?  If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Srvcs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require.").  At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy.  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  In making that determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

### C.    The Administrative Law Judge's Findings

To determine whether plaintiff was disabled, the ALJ conducted the five-part analysis

required by the regulations.  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability.  (*Id*. at 21).  At the second step, the ALJ found that his anxiety disorder and substance-abuse disorder were severe impairments.  (*Id*.).  At step three, the ALJ found that when he was abusing substances, his anxiety impairment medically equalled sections 12.06 and 12.09 on the list of impairments set forth in the regulations.  (*Id*. at 23-24).  However, if he stopped abusing substances, his anxiety disorder, while severe, would not meet or medically equal a listed impairment.  (*Id*. at 24).  Accordingly, the ALJ found that plaintiff, when sober, would have the RFC to perform work at all exertional levels, but would have a moderate limitation in his ability to engage in extensive interaction with the general public.  (*Id*. at 24-27).  At step four, the ALJ found that he would be able to perform his past relevant work if he stopped abusing substances.  (*Id*. at 27-28).[25]

On December 18, 2008, the ALJ issued his decision.  (*Id*. at 28).  He found that although plaintiff exhibited signs of disability during periods when he abused substances, he would not be disabled if he stopped abusing substances.  (*Id*.).  The ALJ concluded that plaintiff's substance-abuse disorder was a contributing factor material to the determination of disability, and that he was therefore not disabled within the meaning of the relevant provisions of the Social Security Act, 42 U.S.C. §§ 416(i) and 223(d).  (*Id*.).

### D.      Plaintiff's Objection to the Omission of Evidence of Physical Ailments

In this appeal, plaintiff has submitted medical records concerning his upper neck, shoulder, and lower back problems, which he contends should have been considered by the ALJ at his SSDI

---

[25] The ALJ obtained new evidence (an expert medical opinion) at the hearing and disagreed with the federal reviewing officer's prior conclusion that plaintiff did not have the RFC to perform his past relevant work. (*Id*. at 28, 96).

hearing.  Of the documents that plaintiff has submitted, only one is a medical record.  These records consist of plaintiff's long-term disability statement, in which he alleges disability due to anxiety, cervical radiculopathy, and lower back pain; two letters from The Hartford dated January 5, 2006, and October 11, 2006, informing him that his claims for short-term and long-term disability, respectively, had been approved; a December 12, 2005, letter from National Imaging Associates, Inc., confirming a mutual agreement between it and plaintiff to withdraw his request for a neck MRI; a December 16, 2009, letter from Atul L. Bhat, M.D., to Spyridon Kantas, M.D., discussing plaintiff's MRIs of the cervical and lumbar spine and his follow-up evaluation; a cover letter from Dr. Hopkins indicating that he had attached five pages of plaintiff's medical records in support of his short-term and long-term disability applications (no attachments were found); and a letter from plaintiff to a Dr. Taylor that provides dates for his short-term disability insurance paperwork.

The letter from Dr. Bhat indicates that on December 11, 2009, MRIs of plaintiff's cervical and lumbar spine were performed.  (Pl. Br. Ex. I).  The MRI of his cervical spine demonstrated relative flattening of the normal cervical lordosis; moderate right-sided facet osteroarthritis at C2-C3; left severe foraminal narrowing noted at the C3-C4 level; moderate bilateral foraminal narrowing at C5-C6, where there is also mild to moderate central stenosis; and right foraminal narrowing at C6-C7.  (*Id.*).  No evidence for any cord signal change was noted.  (*Id.*).  The MRI of his lumbar spine confirmed disc dessication at all lumbar segments, bone-on-bone deformity noted at the L4-L5 level and greater than 75% loss of disc height noted at the L5-S1, moderate to severe spinal stenosis noted at the L4-L5 level, as well as some moderate bilateral lateral recess narrowing at L5-S1.  (*Id.*).  In response to plaintiff's complaints that he experienced numbness and

tingling in his upper extremities, Dr. Bhat suggested a formal surgical consultation, which plaintiff "declined more than once." (*Id.*).  Plaintiff informed Dr. Bhat that he would rather be prescribed pain medication, and expressed, several times, a desire for Vicodin.  (*Id.*).

Dr. Bhat acknowledged that "multilevel spinal stenosis both in the cervical spine as well as in the lumbar spine . . . can certainly cause radicular complaints as well as upper and/or any lower extremity sensory complaints," but did not recommend any interventional injection therapy.  (*Id.*). He concluded that since plaintiff did not want to pursue surgical options, there was "nothing else his office could offer him." (*Id.*).

Plaintiff appears to contend that the decision of the ALJ should be reversed because this evidence of physical ailments related to his upper neck, shoulder, and lower back was not considered by the ALJ along with the evidence concerning his mental disorders.  Defendant contends that there is substantial evidence in the record supporting the ALJ's decision and that plaintiff failed to present available evidence of these alleged physical impairments during those proceedings.

The Court may order additional evidence to be taken only upon a showing that the new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g).  New evidence is material if the ALJ's decision "might reasonably have been different" if the evidence had been considered.  *Evangelista*, 826 F.2d at 140 (quoting *Falu v. Sec'y of Health & Human Srvcs*, 703 F.2d 24, 27 (1st Cir.1983)).  Here, plaintiff has met neither requirement for an order remanding the decision of the ALJ for reconsideration based on new evidence.

As to the first requirement, plaintiff suggests no grounds on which the administrative

decision might reasonably have been different if the ALJ had considered evidence of the physical impairments that plaintiff now raises. The ALJ concluded that if the plaintiff stopped the substance abuse, he would have the residual functional capacity to perform work at all exertional levels. (A.R. at 24). The ALJ determined the plaintiff's statements regarding the intensity, persistence, and limiting effects of his underlying medically determinable physical or mental impairment(s) to be not credible. (*Id*. at 25).

Moreover, substantial evidence in the record supports the ALJ's conclusion that no physical afflictions rendered plaintiff disabled. A pain questionnaire that plaintiff has submitted does not allude to any of the impairments he now claims to have suffered. (*Id*. at 137). A disability report states agoraphobia is the only illness that limits his ability to work and that his conditions do not cause him pain or other symptoms. (*Id*. at 159). It further states he could walk, stand, sit, stoop, kneel, crouch, handle, grab, and grasp big objects in the course of performing his job. (*Id*.). In a letter dated July 5, 2006, Doctor Hopkins states that plaintiff had recovered from his neck and shoulder pain. (*Id*. at 220). The fact that the ALJ explicitly considered plaintiff's physical abilities and determined that plaintiff was not disabled belies plaintiff's argument that the examiner might have reached a different result by considering the evidence he now raises. In sum, plaintiff provides no evidence that the decision of the ALJ "might reasonably have been different" if the evidence plaintiff now offers had been considered. The new evidence is therefore not material, and a remand of the ALJ's decision is not warranted.

Moreover, even if the new evidence were material, remand would be unwarranted because plaintiff has not satisfied the second requirement for a remand by showing good cause for his failure to present that evidence during the administrative process. Plaintiff appeared and testified

28

at the SSDI hearing.  (*Id*. at 19).  After the SSDI hearing, the ALJ granted plaintiff two weeks to submit any additional evidence if plaintiff thought the record was incomplete.  (*Id*. at 86).  Plaintiff did not present any evidence of these impairments at either opportunity, nor has he offered a good cause explanation for its absence.  This failure is particularly salient because plaintiff was represented by counsel at his hearing who presumably was capable of raising relevant evidence within the two-week period provided by the ALJ.  (*Id*. at 19).

In sum, although plaintiff contends that additional evidence should have been considered by the ALJ, he has shown neither that the new evidence is material nor that there is good cause for his failure to presented it during the administrative process.

## IV.    Conclusion

For the foregoing reasons, the Commissioner's motion to affirm is GRANTED.

**So ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 29, 2012